Next case on this morning's docket is the case of Phillips v. State Farm Insurance, and we have Ms. Penny Livingston for the appellant, and we have Mr. Martin Morrissey and Mr. Michael Podesky for the appellate. And gentlemen, are you dividing your time? Mr. Morrissey, are you arguing? Ms. Livingston, when you are ready, you may proceed. Thank you, Your Honor. May it please the Court, I'm Penny Livingston. I represent Mr. Ryan Phillips, who is also in the courtroom. The statute involved here in this case is the Consumer Fraud and Deceptive Practices Act, and it is a statute in Illinois, and it references another statute in Illinois, which is the Uniform Deceptive Trade Practices Act, which specifically says that a person engages in a deceptive trade practice when in the course of his business, he engages in any conduct which similarly creates a likelihood of confusion or misunderstanding. Not just unfair, not just defrauding, but if you create an atmosphere of confusion and misunderstanding, you're also in violation of the law. What we have here is a situation where Plaintiff's case, when they began trial, was that Ms. Stephanie Stover had known the day of the fire that she had made a miscalculation, because she testified that she had conversations with my car cop, but he never had any conversations with her until he was in the hallway. And she said she didn't even know him, yet we found memos in the 10,000 pages of electronic dump that showed that she was sending him emails, so she did know him. So what we have is this discovery, the discovery violations were overwhelming. I asked him for conversations with Aaron Fields and my client. In 2013, they don't disclose any conversations. Then we have his deposition, and he discloses conversations. Are there any other ones? No. Then he signs an affidavit attached to a motion for summary judgment saying, well, I told the Plaintiff that the reformed number would be 774. If they told the Plaintiff the number would be 774, which they never did, which is what the judge's finding is that the defendant, that the Plaintiff was informed of this amount and he agreed to it. That's the finding. And that is against the manifest weight of evidence, as no one ever told the Plaintiff that his policy was reformed to 774, or why does he have to argue up the number from the lowball number that claims the non-person? In other words, if State Farm came up with the right number to reform this policy, where's the deck page? 10,000 pages of document, and the first page that they give us is a new deck page saying 774 that was created a year after the litigation started to try to trick us into thinking that the policy had been reformed. They never gave him a deck page. They never told him what it was reformed to. Stephanie Stover made an error. We believe she knew about her error the day of the fire. I was literally changing the jury instructions and sending them at 3.30 in the morning the last day of trial because I did not get that there were two different models and that the models were tilted until we flushed it out of trial. Because I never got to test any of my documents because every document I used was given to me after the deposition of the person who actually created the document, so that we were constantly in the dark. We didn't have the claims law before the claims guy's deposition, even though he certified that he gave us every document he had and his entire testimony was, well, I have to refer to my law that I don't have, that he took back to his car. This is the most egregious discovery violation case I could even have imagined or heard of in the history of 30 years of practicing law. Two weeks before trial, I find a document that they give me and they tell me that they'll give it to me in January after I sign a protective order so that they can give me the billing records of my client's bills to see how the price gouging works when you charge someone $187 a month for $440 worth of coverage. And now you want to charge $700 a month for $100,000 less in coverage? Makes no sense at all. And when you do the math, you see that they committed the crime, really. They committed the violation of the Consumer Fraud Act by price gouging. They said, we're going to reform your policy. We have superior bargaining power. We're going to reform your policy. They said they told him to $774, but then they don't offer him $774 for nine months after they determined that that's the right amount. And they make him prove on his law school that it's gone, their mistake. The billing is gone because of their mistake. If the claims adjuster had known that there was an 80% actual cash value rule and that that was the lowest amount that could ever be written for a commercial policy, if he had known that, then he would have known the day of the fire that the face value wasn't anywhere near 80% of actual cash value and he would have known there was an error. And then he could have hired a structural engineer to show that this steel beam triple brick building was, in fact, structurally sound. The roof had burned. Some of the interior had burned. It could have been rebuilt. But it wasn't rebuilt. And the plaintiff lost $42,000 a year in income off of this wonderful commercial building because it wasn't rebuilt. And it wasn't rebuilt because the face value was wrong. State Farm knew it was wrong, even if Mike Harcott, who was a claims adjuster for large commercial offices for 25 years, and they compartmentalized it and keep him in the dark and don't tell him about this 80% rule so that the error couldn't be discovered at the time of the fire. We thought the case was they knew about it. They didn't tell us. It turns out that the case was about price gouging where they charge him this exorbitant premium. And then we get the memos close to trial that show, this is I think on page 124 of the appendix, that show that Stephanie Stover says that the premium should be calculated for three months of coverage because it's date of issuance to date of fire. You charge $2,000 for three months of coverage of $300,000 when you charge $2,000 coverage for 12 months of coverage for $400,000? That's price gouging. And they say, well, we communicated this to Ronnie. Well, if they did that, then why is he having to prove to them what his building is worth and why are they making multiple payments? Every payment says paid in full, and it's not. And Mike Harcott testified that, yeah, it says paid in full, but it doesn't really mean that. They have no release, 10,000 pages of documents. There's no release signed by the plaintiff to show that he agreed to the amount that they say. And, in fact, they make this up in the middle of the case to support their summary judgment with undisclosed conversations that have been tested through depositions. They hid Stephanie Stover from us for years, never disclosed her. Mike Harcott testified he didn't know who the underwriter was. At trial, he says, oh, I thought you meant an administrative underwriter. There's no such thing as an administrative underwriter. He knew who she was, and he hid her. Then when I find her, they won't give her to me. I finally have to subpoena her. They come in on a motion to quash the subpoena, and the judge denies it, and she still doesn't show up for a deposition. And when she does, she's supposed to bring all these documents. And months later, I'm given hundreds of pages of e-mails between her and Mike Harcott that are not in her deposition, even though she testifies in a deposition. This is her whole file that I asked for two years, two and a half years before that and didn't get. They made a concerted effort to hide the truth so that we couldn't figure out what was really going on. And the discovery violations bogged the trial down because we couldn't get all of our evidence. And we didn't even get to call the exact where expert. By the way, they identified an exact where expert late on in the case. But where's the exactimate expert? If you look at the guideline that we were given shortly before trial, it says that estimating tools are designed to provide estimates for true— that they are not designed to provide estimates for truly unique buildings or structures that include nontraditional building materials or designs. You know, like triple brick built in the early 1900s with steel beams, I-beams. This was a—the Historic Society got the Jalowski windows, and it's in State Farm's own reports that we eventually get. So the modeling shouldn't have even been used. So when they say there was an agreement here and the judge finds there was an agreement here, how could you have an agreement when you don't know what the actual cash value is? By the way, not only does Mr. Harcott not know about the 80 percent rule, there's no 80 percent of actual cash value written in the policy. We all assume that it's 80 percent because that's what State Farm told us was the lowest amount that they could write it for, and my client wanted lower premiums. But the policy itself speaks of actual cash value, so why are you applying 80 percent? When you look at the numbers on the model—and this was the most shocking thing at trial, and you'll see I asked to amend my complaint, and I put this in. I didn't know this in my amended complaint that I put in right before the jury trial to go to the jury. If you look at the numbers, what you end up seeing is Harcott says that the buildings are worth $1.2 million, whereas Stephanie Stover, underwriting, says they're worth $2.4 million, and our expert says they're worth more like $3 million. So how is it that Stephanie Stover modeling that State Farm uses—and by the way, Exhibit Number 39 at A341 also says that exact where is a contract that State Farm has, and that claims agents and underwriting all use it, yet they don't. Claims uses a different program, and their program is rigged to pay people lower payouts. And you can see this when Stover applies 60 percent depreciation to $2.4 million, and then she deducts 80 percent extra cash value, and her number is exactly the same as what Harcott pays out, and he determines the value to be $1.2 million and applies 40 percent depreciation. How does that work? They are jimmying these numbers, and they have tilted models. This is a scheme to rip off Illinois consumers, probably all consumers. So when you go to get your premium, we'll say that your building's worth this higher amount of money, and we'll charge you this higher premium. But when we go to do claims, we have a different model, and that model is going to say that your building is worth much less. If we had applied Harcott's same numbers to Stephanie Stover's model, it would have said that this building was worth a lot more. This is consumer fraud. That is what consumer fraud is. And no wonder they were hiding all the documents from us for three years and hiding the underwriter from us. And by the way, then they get a protective order to say that, you know, we're not going to give you the building information you asked for three years ago unless you sign this protective order, and they got a court order ordering you to sign a protective order. And in their protective order, they argue, well, you know, we have this Kelly Thomas billing person, and, you know, when she deposes them, she'll find out what this is all about. I deposed Kelly Thomas. She doesn't know anything about billing. Stephanie Stover drafted the document, and when you look at the document itself, it says here's the billing records from Kelly Thomas, but they're not from Kelly Thomas. She doesn't know anything. We didn't get her called, but we have the testimony where she knows nothing. And so Stephanie Stover testified, I don't know anything about billing. Of course, I've given you my complete file, and I haven't really asked her where was she the day that she was subpoenaed. I don't know. They were going to get another date. There's no agreement to another date. They tried to quash the subpoena, and she should have showed up, and she should have brought her documents. There was a concerted effort all along to hide things, not only the last bit of documents that they gave us. You had to click on individual pages to get 5,000 pages of documents when the first 5,000 pages had nothing in them? So, and if you, in fact, if you look at pages in the index, you'll see that some of the emails are 200 pages apart, and they're the same stream of emails. I saw in here that one was 200 pages, the next one was 54 pages apart, the next one was, like, 20 pages apart. They absolutely made a concerted effort to hide discovery from us, and they would come up with surprise changes in what things were to try to dismiss us with summary judgment saying, oh, see, it was a done deal. And if it was a done deal, why is it that all the way through their brief you have all of the recitation of facts about how Davis called hard cop and he admitted that it was, you know, Mr. May was sick and he was dying, so therefore there was some delay there. If you told my client that he was going to get $774,000 if he paid two grand, yeah, he'd pay it and take the money, and he wouldn't have known any better. But because they were jacking him around and they weren't paying him and they weren't telling him anything, he hired Bob Davis, the public adjuster. Bob Davis testified. I didn't know what the number was. It was constantly changing. No one ever communicated a 774 number. There's no deck page on that. There's no correspondence or communication on that. The only thing you have is an affidavit and an act-of-the-fact statement from Aaron Fields who, if you get the time to read his testimony, you will see is the biggest liar in the world. I couldn't even believe it. I've proposed real liars before in superfund cases. This guy just lied and lied and lied, and we proved it, and it took a long time to do it. It took a lot of trial time. He also disclosed information that was in violation of Motion to Eliminate. They knew. They had so many motions about this secret tape, and they knew that the judge said, no, you are not to mention that this meeting was taped by Ronnie Phillips. And boy, did he get that right out there when Mr. Morrissey was asking, oh, I didn't know about it. I didn't know about it. Really? He prepped him, and you didn't tell him you don't get to say this when it was such a controversy all along, just like he wasn't supposed to say that he'd been sued, and the jury sends back a question, are we even supposed to consider Aaron Fields' testimony? Well, are you? He's such a liar, who would? But he wasn't, they weren't supposed to say that the court dismissed him from the lawsuit. You know, it started with a breach of contract. I faced eight motions to dismiss. They know insurance law. I'm an environmental guy. I got into this case from asbestos that was on the ground. They hid things from me all along. They did not let me learn my case, and I was learning my case at trial. It took too long. It was harsh. But I did learn it, and what I learned at trial was that they have tilted models. There's a scheme to defraud consumers of what they've been paying for the benefit of the bargain. I also learned that, oh, here's a memo that says that the premium was only for three months. I filed a class action lawsuit, asked the judge to amend my pleadings to do class action because I thought that they were charging for 12 months when the building had been burned down for nine. Didn't that seem like fraud to me? Oh, no, contraire. They have a memo that they'll dump on you if you click on each individual page after you put in a code for 5,000 pages. They have a document that shows, Exhibit 44, that shows, well, this is for three months. Well, why did you charge him what equates to $700 a month for $300,000 coverage when less than $200 bought $400,000 worth of coverage, less than $200 a month? That is price gouging, plain and simple, and that's what they did. And then they covered it up by saying, Kelly Thomas came up with this billing scheme. They should have given me it in July of 2013 when I asked for it. Instead, they objected and said it didn't exist and signed an affidavit saying none of these, we gave you a complete file. Well, they didn't give me a complete file. I got 6,000 more pages after the supposed complete file, and everything I got was after depositions. I asked to re-depose Stephanie Stover after I figured out that she was the one who was doing the price review, not Kelly Thomas, who didn't know anything, and the judge denied that. So we had price gouging. They say that there was retroactive reformation. Well, that would require an agreement. All of the conduct shows that there wasn't an agreement because if there was an agreement, why didn't they write him a check? Why didn't they send it to claims? And why does a public adjuster have to keep proving over and over, well, I had a mezzanine. I had steel beams. Oh, I had some gelosi windows. Can you get that up a little higher, up a little higher? When you look at the map, and I've covered it pretty well in the brief, you can see that, in fact, the numbers totally don't genuine. They really have two different models that they use, one for setting premiums and one for paying out, and the models are tilted to rip off consumers, and they really did price gouge him, and so it wasn't just about they knew the day of the fire and jacked him around. That's what the fraud was. You jacked my guy around for two years and didn't pay him what you should have and you hid it from him. Well, they did, but why were they doing it? Well, it was a bigger scheme than we ever could have known, a scheme to augment profits by not giving utmost good faith, and, you know, the law says that if there's any ambiguity, then the benefit should go to the insurer, and they argue in their brief, well, there was no ambiguity. How could there be any ambiguity? We don't even know what the policy should have been set at, and they never even gave him a debt page to say it, and if they told him it was that amount, then why are they offering him $200,000 less than that six months later, and then why are they offering him $266,000, which was still $72,000 shy, and that came a couple months later, and it's all prove it, prove it, prove it, and they say, well, he agreed, and that was it. Well, every payment says payment in full, and Hardcock says that doesn't really mean anything because he writes it, but it isn't. So where's the release that would prove that plaintiffs shouldn't have been able to sue because he already got the benefit of his bargain? No, he didn't get the benefit of his bargain. They used modeling when their own guidelines say that they shouldn't. This was a unique building. Their own documents show that it's a unique building. Photographs show it's a unique building. Then when they do use their modeling, they apply a 60% depreciation. The woman didn't even know it had a second floor, let alone an elevator and steel beams, and she's given it 60% depreciation, and what does her number come to after she deducts another 20%? $774,000, and what does Hardcock's number come to when he applies 40% and when he doesn't take a 20% deduction? Same number. It's a bunch of games of playing with numbers, and it's not utmost good faith in how you treat your insurance. We should have never had to sue, and you certainly don't do $300,000 worth of attorney time on a $300,000 case. This was concerted to make sure that we did not learn the truth, and it was concerted to make sure that all consumers would be deterred and that we would never figure out what was really going on. This court has recently sanctioned people for discovery violations. I think if you look at the facts in that case and you look at the facts in this case, you'll see this case is worse. In that case, this court opined that discovery is not a tactical game. It certainly was here. I couldn't get anything until after depositions were taken, and then I couldn't get redeposition. They argued, well, plaintiffs are offered to do more discovery. Really, on the eve of the second trial, I'm offered to do more discovery? Why? They don't bring documents. I should now tell them that I found these documents and let them lie about those too, which they did. The record is that you have that entire transcript, so you know how many different stories were told. This court found that discovery is intended, as it should be, to be a cooperative undertaking by counsel and the parties, conducted largely without court intervention, for the purpose of ascertaining the merits of the case and thus promoting either a fair settlement or a fair trial. Truthful disclosure is the object of discovery procedures. Stock objections and fractional disclosures render our discovery rules and procedures meaningless. That's exactly what happened here. I had the hardest time finding out the truth, couldn't even figure out who the underwriter was. Then I find out I can't get her. Then I get her. They don't give me her documents. Then they give me her documents. Then they have her create other documents and tell me that it's somebody else. I think you can see from the facts what went on in this case, and I appreciate your full attention to it. I think this is one of the most important cases you'll ever decide, because this is how they conduct themselves in all their cases. You'll have the opportunity for rebuttal, Mr. Livingston. Mr. Morrissey? Your Honor, thank you. Please support. I started writing down the word liar, I guess, in that presentation, and I stopped at about 10. I just think it's important to emphasize here that we have a system. Juries and the judge, in relation to the ICFA case, it's very important that we understand that the fact-finders here made the decisions they made after hearing all the evidence in this case, and they found them for state form. This plaintiff has provided no basis upon which to overturn either the jury verdict or the child court's judgment. With regard to the jury, the fact-finder in our jurisprudence on the common law fraud claim, that verdict must be upheld, unless the plaintiff can demonstrate that it was manifestly and palpably against the weight of the evidence. And we know that the evidence has to be considered in the light most favorable to the party who prevailed at trial. The plaintiff clearly has not carried this heavy burden to the contrary. As we address in detail in our brief, there was ample evidence supporting the jury's decision. The evidence also supported the child court's, Judge Coker's, independent ruling on the Consumer Fraud Act claim. He is a fact-finder under the Illinois Consumer Fraud Act. The evidence showed that the error in setting the coverage limits initially for this building was an honest mistake. Ms. Stover made an honest error. State Farm did not commit any deceptive act. The plaintiff did not sustain any injury. Those findings are entitled to the same weight as the jury's verdict. The plaintiff has provided no basis to overturn them. Finally, the court should reject plaintiff's attempt to overturn the decisions by claiming various discovery violations. The plaintiff did not raise any of those issues until the jury rendered its verdict in State Farm's favor. And the trial court proudly concluded that the issues were weighed. The plaintiff has failed to show that the trial court has used its discretion in reaching that conclusion. Furthermore, as discussed in detail in our brief, there is no basis for the plaintiff's assertions that State Farm failed to comply with discovery obligations. I can't put a nail in every tree. The documents concerning the undivided file were given to the other side a full year before the trial. The claim records were given a full year before the trial. We cover that in our brief, and I'm not going to spend a lot of time on it. But for these reasons and for the additional reasons set forth in the brief that we hope to discuss here, these judgments should be affirmed. A couple of issues here. The trial wasn't a trial court's decision on the Illinois Consumer Fraud Act claim finding four State Farms against this plaintiff was against the manifest way of the evidence. The second issue, did the trial court abuse its discretion in upholding the jury's verdict, the jury's verdict finding that the plaintiff did not prove common law fraud? Both decisions of the trial court on these questions were well supported in the evidence. Now, we have a basic timeline of facts. Your Honors are aware of those. The plaintiff brought coverage for the building, 205-207 structure. In February 2010, the fire occurred three months later. State Farm promptly paid the policy limits of $436,000 for the lost part of that structure. They were insured as one structure, had a common wall. 205 was lost, but 207 was still standing. A year later, the State Farm agent and the plaintiff discovered an underwriting measurement error. Stephanie Stover, the employee, did not measure the structure correctly, left off about 10,000 square foot space upstairs of the 205 structure. She wasn't fired upstairs. She didn't go upstairs. She should have been more thorough. State Farm, then, would have offered 80% of actual cash value, which would have been $774,000, except because of the measuring error, offered $436,000 in coverage. Now, the evidence demonstrated that Mr. Phillips never wanted to buy $436,000 in coverage, only wanted to buy $200,000 in coverage, and never testified that he would have actually purchased $774,000 in coverage had he been given the opportunity. But nevertheless, State Farm made the measuring error, violated their internal policy to not offer coverage less than 80% in ACVs. So, the parties agreed, along with Plaintiff's public adjuster, who he consulted with on the very subject, to reform this policy to that amount that he would have been offered in the beginning. Ultimately, the claim was adjusted, and the plaintiff was further paid the $337,000 additional dollars, so being paid a total of, I think it was $823,000, was paid everything, and his contract was fulfilled. Three months later, State Farm, after that went down, and the insurer and the public adjuster took all those extra payments after the adjustment. He sued State Farm for common law fraud and statutory fraud. Now, after nine complaints, nine amendments, one of which was entered the second day of trial, we went to jury trial, nine witnesses, 130 exhibits, and the jury found for State Farm against the plaintiff. And they executed an interrogatory that was provided to the jury that said that plaintiff had in fact paid the 2046 in premiums in November 2011 to increase his property damage limits to the greater amount, $774,000. The judge heard the same evidence, same witness, looked at the same exhibits, and found that not only did the plaintiff fail to prove statutory fraud, that's in his order of June 2016, but factually and legally, the plaintiff had agreed to reform his policy after that error was discovered, that the 2046 in premium was paid to increase that limit, and the policy was in fact performed. So two fact-finders acting independently, the judge independently on the ICFA and the jury on the common law fraud. And I want to emphasize to the panel that the judge's decision was made under the Illinois Consumer Fraud Act, where the burden of proof is the preponderance of evidence. It's lower. So it is quite right to consider how woefully short this plaintiff fell in establishing the elements of common law fraud to the jury by clearing convincing evidence, which is the burden of proof there. Now, this court is familiar with its role. The case isn't to be retried, and evidence is not supposed to be reweighed. Here we have two fact-finders, finding that the plaintiff did not meet his burden of proof, and the jury's decision must be demonstrably mismanifest weight. The trial court's decision must be demonstrably mismanifest weight. And we do give deference to the fact that this trial court heard those witnesses and listened to them and had to weigh their credibility, and he carefully did that. Why should this trial judge's decision be affirmed? Ultimately, for two reasons, and I've already alluded to them. First, there was a reformation. The parties can do a reformation. They can fix an error. Our law permits it. That was reformed so that he would obtain to the coverage amount that he would have purchased in the beginning for that agreement. State Farm made the error. They investigated. They made the proposal. And it is established law that if a fraud or mistake in a transaction occurs when the contract is formed and is discovered later, the party cannot go forward and accept the benefits of that transaction and later sue. And we cite our authorities in the brief. It can't be a head's-eye, win-tails-you-lose situation. The law doesn't permit it. And this judge found factually and legally that this occurred here. That's the law. That's the legal principle properly applied. And the second reason I've alluded to that, fraud just wasn't proven. Didn't meet the burden of proof in either the jury case or the ICFA case. What were the reformation facts? Because we just heard her get up here and say, well, there wasn't anything. And we never agreed to that. That wasn't proven. The evidence on that was overwhelming. And we argued that in the beginning, in the middle, and the end of this case. Plaintiff twisted himself into a human pretzel at trial, denying that the reformation occurred, suggesting he didn't know what was going on, that he didn't have a conversation with his agent about it. My goodness. The plaintiff testified one day. I never had a conversation with him about modifying the coverage to $774,000. And the next day, the public adjusted that the plaintiff hired to assist him with the transaction testifies 2460-2461. I never saw a reform policy. It was on a piece of paper. Yes. Yes, because the agent gave him the exact word that showed exactly what his limit was going to be. Yes, Phillips told me of several conversations with the agent on the reform policy. Yes, he told me that the agent said the $2,000 would reform his policy. One day, he says, I never had the conversation with the agent. And the next day, his own PA testifies and sequenced what Mr. Phillips told him about that conversation. He was a contractor building on a commercial landlord for 30 years. Numerous loans over the years purchased many insurance policies. The evidence and the inferences were plain to see. The jury saw them. The judge saw them. His agent explained the error to him when it was found. Stephanie Stover, the underwriter, felt terrible about it. She went out to remeasure it. When she remeasured it, she told him that she was going to try to make it right. That's in her testimony. Aaron Peels met with him. The agent met with him a number of times when underwriting had redone the proposal to try to make it right, like what the offer would have been. Exhibit 17, 18, 18A, those all demonstrate evolution. Because Mr. Phillips negotiated that exact word. He said, no, I don't agree with the first proposal. I want to add a few things to it. HVCA units, rubber roof. And the inputs were negotiated and accepted at every juncture by State Farm, which increased his limit after this fight. Which increased his limit. And he gave him, the agent Peels said he gave him a copy of the exact word with the calculations for the new amount of coverage. And the PA testified to it the next day. Then, before the plaintiff paid the premium to reform his policy, his public adjuster advised him to accept the proposal. And he testified to that also. That's a deal that would take any day of the week. Further, as if there needs to be a further, Exhibit 16, a contemporary email document generated at State Farm underwriting after agent Peels had met with him and Mr. Phillips had accepted the modified exact word. Finally, Mr. Phillips wrote that check, Exhibit 19. Consulting with his public adjuster, he even wrote on the premium for the 207 structure. This is a businessman who entered into a favorable arms length transaction with consultation with his PA to reform those limits. I'm confused about these numbers that she said about an underwriting of 2.4 million. Because the 2.4 million was for the two adjoining structures. And they each had about the same square footage. So, the estimated replacement cost of the new underwriting estimate, when cut in half, is about 1.2 million. Now, after the reformation, what happened? The public adjuster that he hired engaged to readjust the loss. Did it reach the limit? They spoke. They spoke together. The claims adjuster that he'd hired and the claims adjuster at State Farm, they eventually reconciled their estimates and accepted every payment. Cashing every check. Never saying, we don't have a deal here. We don't have an amended limit. We don't have that. Accepted every single payment. Was it hardly surprising, was it hardly surprising that the jury would conclude there was a reformation, that the judge found there was a reformation? Of course, credibility determinations were important in this case. They always are. Both to the trial judge and to the jury. And in our jurisprudence, that's who's supposed to decide those. And they did. And how important, how important was that issue? Just look at what was said in the closing argument. Said, and I quote, there's a special interrogatory for you to find and in return for his check, he gets $774,000 in coverage. And if you believe that, fine for the defendant. If you believe that, fine for the defendant. They did. And they did. And the judge did. And he did. Because that's what the facts showed. There's nothing arbitrary or unreasonable about this fight. An opposite conclusion would have been unreasonable. Significant, powerful, credible evidence supported the resolution here. And there was no established damages. He got everything that he was entitled to under his reform policy. Every nickel. Is this not a good thing? Is it not a good thing that parties resolve a mistake? She missed the upstairs. She missed the square footage. The mistake was found. They wanted to help the customer. They wanted to have goodwill. The customer wanted to be helped. The law recognizes the ability of people to do this. And the law recognizes that a person cannot recognize that error, accept the benefits of the reformation, then later show a mistake. This judge, after listening to the evidence, independently found that the reformation occurred. It's in his June order. And because that's the way it shook out, that makes the case. Now, there's a second reason why the decision should be affirmed. There wasn't any evidence of fraud. The plaintiff utterly failed to meet his burden for common law fraud. The plaintiff's burden on common law fraud was clear and convincing and never came close. Stephanie Stover came in and testified. Look, I made a mistake. She wasn't hiding it. She wasn't concealing it. She didn't say something to try to get somebody to rely on it. The jury had every right to believe this witness. Further, the plaintiff didn't rely on it. He said he was never going to purchase. He never said he was going to purchase $774,000 in coverage. Anyway, it was a good arrangement all around. Finally, we established that the reform contract, he got everything, and there were no damages demonstrated as a result of the omission. He was fully paid. That is contract compliance. Now, after it became obvious that Ms. Stover had made but an innocent error, the plaintiff tried to say, well, the reformation itself was somehow a bad deal. Incredible. He negotiated. He had inputs into it. You can see them from the exhibits. They incorporated his changes. And he wrote the check, and he took all the benefits, and the public adjustery hire affirmed it. So then the theory changes again. Well, the amount of coverage that was calculated, that was wrong. $774,000 based on bad replacement cost estimate, and they're talking about $1.2 million in that. The evidence is clear. That the public adjuster that he hired, and 205 was the issue, okay? 205 was the issue. The public adjuster that he hires has an estimated replacement cost within 3% of the estimated replacement cost at state farm rates. And if you take the entire structure, estimated replacement cost, from the underwriting file, the amended one, $2.4 million, and you cut it in half for 205, what do you come up with? $1.2 million. What was the public adjuster? $1.18. What was the state farm? $1.15. All within about 3% or 4% of each other. About $85 per square foot. So plaintiff, what does plaintiff do? Plaintiff calls Mr. McDermott a contractor, not an underwriter or adjuster. And his testimony was based on fantasy. He assumed the entire 205 structure contained finished square foot space. That was not true, and he admitted he moved. It had a basement, a garage. Finished square foot space is much different in price, and when you average it, it makes the average square foot price lower. Instead, he assumes total finished square foot space for that structure. Inconsistent with plaintiff's own public adjuster. And we can only look at Exhibit 28, the public adjuster adjustment, that we enter into evidence because it demonstrates the basement was there. I remember challenging the witness to say, don't you think the insurance should go to the building that's actually there? Not a pretend building with finished square foot space, total throughout. So the plaintiff was placed in the unenviable position of getting up from a jury and saying, you know what, my PA's wrong. He's using hocus pocus. There's a lot of labeling going on here. After the train wreck that was that witness, so-called damaged witness, it's hardly surprising. May I close? Yes. Brief statement? Yes. This trial judge bent over backwards to accommodate the plaintiff in the trial date that they wanted, getting all the exhibits in. It was established that fraud was not proven. It was established that a reformation took place. The benefits of that reformation were fully accepted. There were no damages. We believe that the judge's decisions should be affirmed. Thank you very much. Thank you, Mr. Morrissey. Ms. Livingston, rebuttal? This man accounted for the 3,500 feet, which is not very much, and 28,000. She missed 10,000 square feet, or 14. He miscalculates the 3,500. He didn't realize it was a basement, and he corrected it on the stand. There's still more than $200,000 worth of damages for two buildings here. And he's right. Each one was worth 1.2. The second building was heavily damaged as well. And when you look at how they calculate the damages, they're basically saying we're paying you actual cash value for the one building, but the other building was heavily damaged as well. And it gets lost in the whole shuffle of what damages are being paid here. They did not pay the fair market value. They did not pay the depreciation subtracted from replacing the cost for actual cash value. They didn't even pay 80% of actual cash value. McDermott built a real building, came up with $113 per square foot. The claims guy consulted someone. This is in the record. And they said $109 would be a proper amount. And in one of his calculations, he had $109, but then he had a certain depreciation. They changed the depreciation in their brief. They say, well, when you change numbers, the depreciation will change. No, it won't. It's the same building. It's the same age. It's the same condition. You're just putting more data in. They never do address those two separate numbers anywhere in their brief. Bob Davis testified that he didn't know what the number was and that the number wasn't right. And that's true that McDermott said less was owed than the modeler public adjuster said. Ronnie didn't hire the public adjuster until November. They knew the amount they were going to pay in August. They say they communicated it in October and that they made changes. You look in the record. She made changes. She upped the amount by $4,000 two months later. And all the time that Bob Davis is giving information, the claims guy can't do anything about it because he can only pay the face value that she determined where she didn't have any of that information. They have an utmost duty to consider new information, and because of the way they compartmentalize people, they didn't consider that new information because Harcock couldn't do anything to increase it above what she made the number be. He just couldn't. I recently came across a quote from the Declaration of Independence where it said, All experience hath shown that mankind are more disposed to suffer, while evils are sufferable, than to right them by abolishing the forms of which they are accustomed. We're accustomed to the insurance companies doing things the way they do, although I don't think until this case anyone knew that there were two models that did things very differently, and the facts do show that they did, and you can do the math. And there are statements about, well, you know, every time you plug in data, you know, the depreciation's going to change. No, they testified that depreciation was based on age and condition. Even McDermott said he would have accepted 50% depreciation because it was an old building, but that wasn't what Harcock applied. He applied 40 in the end. Sometimes he applied 29. It was continuously varying to come up with the numbers that would give him authority to ask for additional payout. There was no utmost good faith show anywhere here, and the contract was ambiguous as a matter of law because we don't know what is the real actual cash value. We don't even know that he agreed to 80%, but we don't even know what that number is because they used a model that they shouldn't have used according to their own guidelines, which they hid from me for three years. Then when they do do the modeling, they apply an inappropriate depreciation. It's at least inappropriate compared to what the claims guide gives, and yet the numbers come out the same. It is tilted. On the price of the premium, geez, how long it took me to even get information on all of that when I asked for it three years before, but what you find is they really did charge $2,000 for three months of coverage of $300,000 when 12 months of $2,000 got you $400,000 worth of coverage. I mean, it's just not right. He talks about every single payment. The plaintiff only made one payment, and it was for that premium, and the testimony about this actually is, well, yeah, I told Ron that if they asked for a premium payment and they would continue to give him more money to pay the premium payment, they have superior bargaining power, and what they did with that superior bargaining power was they did not apply utmost good faith, and, in fact, they actually have a concerted scheme  had we not gone to trial because this was not something that got revealed. I want to point out that he mentions Aaron Fields saying different things. If you look, I know you guys have a lot to do, but if you look at Aaron Fields' testimony, you'll even see that on the document that they say, well, my guy participated in, why did he hire a public adjuster? Why wasn't that information considered? Because they weren't painting like they said they were going to, which they never told him. But if you look at it, you'll see that Aaron Fields testifies, oh, no, that's not my handwriting, ha, ha, ha, ha, that must be Ron's handwriting, and his secretary testifies, oh, yeah, that's Aaron's handwriting. I mean, the obfuscation was really something. Thank you for doing justice. Thank you, Ms. Livingston. Thank you, Mr. Morrissey and Mr. Podolsky, for your arguments and briefs, and we won't take any other of your advice, but we're going to be in brief recess again. All rise.